**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DISTRICT**

| | | |
|---|---|---|
| NATIONAL WILDLIFE FEDERATION; | ) | |
| SOUTH CAROLINA WILDLIFE FEDERATION; | ) | |
| NORTH CAROLINA WILDLIFE FEDERATION; | ) | |
| FLORIDA WILDLIFE FEDERATION; | ) | |
| LOUISIANA WILDLIFE FEDERATION; | ) | |
| ASSOCIATION OF NORTHWEST | ) | **COMPLAINT** |
| STEELHEADERS; | ) | |
| CONSERVATION COUNCIL FOR HAWAIʻI; | ) | Case No. 2:26-cv-02897-RMG |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES FISH AND | ) | |
| WILDLIFE SERVICE; DOUG BURGUM, in his | ) | |
| official capacity as Secretary of the United States | ) | |
| Department of the Interior; NATIONAL | ) | |
| MARINE FISHERIES SERVICE; HOWARD | ) | |
| LUTNICK, in his official capacity as Secretary of | ) | |
| The United States Department of Commerce | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

1.      For over fifty years, through twenty-five congressional terms and ten presidential administrations, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, has protected endangered and threatened wildlife from habitat destruction and degradation, the leading cause of extinction.

2.      Congress passed the ESA in 1973 in response to an escalating crisis: the rapid loss of our nation's wildlife due to rampant habitat destruction and degradation. Congress sought "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Recognizing Congress' intent to address the paramount threat of habitat loss, the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries

Service ("NMFS") (collectively "the Services") interpreted and implemented "take" prohibited under the ESA to include significant habitat modification and degradation that kills or injures endangered or threatened wildlife by significantly impairing essential behavioral patterns, such as breeding, feeding, or sheltering. 50 C.F.R. pt. 17.3. This approach, codified in the Services' regulatory definitions of "harm," was adopted contemporaneously with the passage of the ESA and remained consistent for over five decades.

3.      Upon reviewing FWS's harm definition in 1995, the Supreme Court held that the ESA's text, structure, purpose, and legislative history all support that harm includes killing or injuring endangered or threatened wildlife via habitat destruction. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 695–701 (1995).

4.      In contravention of this history and the Supreme Court's decision, the Services now attempt to rescind the definition of "harm" under the ESA. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43,300 (July 14, 2026) (to be codified at 50 C.F.R. pts. 17, 222) ("the Rescission"). The Rescission attempts to shift to a new policy that would regulate only the direct and intentional killing of listed species.

5.      This action challenges the unlawful and arbitrary Rescission, which contravenes bedrock principles of the ESA and the Supreme Court's holding in *Sweet Home* and undermines critical protections that have fostered the survival and recovery of numerous endangered and threatened species.

6.      The Rescission is not the product of reasoned decisionmaking and is arbitrary and capricious and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

2

7.      The Rescission was also promulgated without the environmental analysis required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*

8.      For these violations of law, Plaintiffs seek an order (1) declaring the Rescission unlawful, (2) vacating the Rescission, (3) enjoining Defendants from relying on the Rescission in any way, and (4) reinstating the rescinded harm definitions.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to the APA, 5 U.S.C. §§ 701–706. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and further relief requested pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201–2202.

10.      Venue is proper in this District under 28 U.S.C. § 1391(e) because all Defendants are either agencies or officers of the United States acting in their official capacity, no real property is involved in this action, a Plaintiff and a number of Plaintiffs' members reside in this District, and consequences of the Defendants' violations of law giving rise to the claims will occur in this District. Venue is proper in this Division under Local Civ. Rule 3.01(A)(1) because the defendant federal agencies do business relating to the events and claims at issue in the Charleston Division. In addition, Plaintiff South Carolina Wildlife Federation does business relating to the events of omissions alleged in this Division. *See* Local Civ. Rule 3.01(A)(2).

## PARTIES

### PLAINTIFFS

11.      The plaintiff organizations in this case, along with their members, are committed to conserving "endangered species and threatened species" and "the ecosystems upon which endangered species and threatened species depend." 16 U.S.C. § 1531(b).

3

12.     Plaintiff National Wildlife Federation was established in 1936. Building on the nation's conservation heritage, the National Wildlife Federation is dedicated to ensuring that wildlife, people, and ecosystems thrive in a rapidly changing world and in the face of urgent biodiversity and environmental crises. The National Wildlife Federation is headquartered in Reston, Virginia and works with 52 state and territory affiliates around the country. Among its efforts, the National Wildlife Federation works to develop, promote, and enact science-based solutions to conservation challenges, and its programs help protect numerous endangered and threatened species and their habitats. Members of the National Wildlife Federation include those who regularly enjoy observing specific endangered and/or threatened species. These members actively work to advance the conservation of these species and their habitats, which range from the iconic South Carolina longleaf pine forests where threatened red-cockaded woodpeckers carve out cavities for shelter, to the vast caverns where endangered Virginia big-eared bats and northern long-eared bats return each year to hibernate, to the clear, free-flowing waters that endangered Black Warrior waterdogs and threatened flattened musk turtles call home.

13.     Plaintiff South Carolina Wildlife Federation is a not-for-profit corporation and the oldest conservation organization in South Carolina. It was officially organized in 1946, with operations dating back to 1931. The South Carolina Wildlife Federation is incorporated under the laws of South Carolina. It has approximately 2,000 members. The South Carolina Wildlife Federation works to promote sound stewardship of South Carolina's natural resources, including endangered and threatened species and their ecosystems. Its conservation and education programs focus on protecting habitat for wildlife throughout South Carolina, including in the South Carolina Lowcountry. The South Carolina Wildlife Federation's members regularly recreate in the habitats of endangered Atlantic sturgeon, threatened red-cockaded woodpeckers,

4

threatened loggerhead sea turtles, and other federally listed species, and many enjoy observing and/or photographing these species. Members also include those engaged in ecotourism that relies on the endangered and threatened species of South Carolina's rapidly developing Lowcountry and surrounding coastal waters.

14.     Plaintiff North Carolina Wildlife Federation is North Carolina's oldest and largest statewide non-profit conservation organization. Since 1945, the North Carolina Wildlife Federation has worked with citizens, outdoor enthusiasts, hunters and anglers, government, and industry to safeguard North Carolina's natural resources. Its mission is to protect and promote natural areas throughout the state—both as habitats for native wildlife and as recreational, hunting, fishing, and wildlife observation areas for its members. The North Carolina Wildlife Federation engages in policy, research, education, and direct, hands-on conservation projects. It is headquartered in Raleigh, North Carolina and works on wildlife and habitat issues throughout the state. The North Carolina Wildlife Federation has members with recreational and professional interests in endangered and threatened species, such as those dedicated to the research and recovery of the threatened red-cockaded woodpecker and the conservation of its longleaf pine habitat.

15.     Plaintiff Florida Wildlife Federation is a non-profit conservation organization composed of thousands of citizens in Florida and beyond. The Florida Wildlife Federation was founded in 1936, and it uses a combination of grassroots organizing, advocacy, and litigation to protect iconic Florida wildlife, endangered and threatened species, and ecosystems. Its members include anglers, hunters, outdoor enthusiasts, and conservationists, all united by a common mission of preserving, managing, and improving Florida's ecosystems. A number of the organization's members are conservation professionals dedicated to safeguarding federally listed

species like the threatened West Indian manatee, the threatened red-cockaded woodpecker, and the threatened Florida scrub jay, including through habitat-focused ESA programs.

16.     Plaintiff Louisiana Wildlife Federation is a nonprofit organization founded in 1940 and representing a broad constituency of conservationists including hunters, anglers, birders, and other outdoor enthusiasts who believe in the conservation and protection of the state's natural resources. A focus of the organization is to promote and defend Louisiana's natural habitats and wildlife recovery, including as a priority habitat for threatened and endangered species. The Louisiana black bear, the official state mammal, was listed as federally threatened under the Endangered Species Act. The Federation and others worked to secure proper management and protection and restoration of its habitat, and it was declared recovered in 2016, demonstrating the value of protection under the Endangered Species Act. The Louisiana Wildlife Federation has 10,150 members and supporters including members with professional, research, and recreational interests in endangered fish and wildlife species like the red-cockaded woodpecker, the Louisiana pinesnake, and the whooping crane.

17.     Plaintiff Association of Northwest Steelheaders is the Oregon affiliate of the National Wildlife Federation. One of the oldest conservation and sport fishing advocacy organizations in the Pacific Northwest, the Association of Northwest Steelheaders was founded in 1960 and has over 1,200 members and volunteers. It serves all Pacific Northwest residents who value strong salmon and steelhead runs, clean water, and the sport of angling. Through education and advocacy, the Association of Northwest Steelheaders works to ensure healthy fish populations and habitats for present and future generations to enjoy.

18.     Plaintiff Conservation Council for Hawai'i is the Hawai'i affiliate of the National Wildlife Federation and is dedicated to protecting native Hawaiian plants, animals, and

6

ecosystems for future generations. One of Hawaiʻi's oldest wildlife organizations, Conservation Council for Hawaiʻi is headquartered in Honolulu and has been on the forefront of Hawaiʻi's conservation movement since 1950. Its over 5,500 members and supporters include scientists, farmers, fishers, hunters, educators, artists, business owners, community leaders, elected officials, and more. Conservation Council for Hawaiʻi has been a leader in shaping some of Hawaiʻi's most important conservation policies and programs and has worked to protect its incredible biodiversity and over 400 endangered and threatened species, the most of any U.S. state. The Conservation Council for Hawaiʻi's members have recreational and professional interests in many of these endangered and threatened species. They include professionals dedicated to the conservation of the endangered Kiwikiu (Maui parrotbill), the endangered ʻĀkohekohe (crested honeycreeper), and other unique birds that call Hawaiʻi's forests home.[1]

19.    Plaintiffs and their members are injured by the challenged Rescission. Plaintiffs' members include individuals with professional and economic interest in listed species, such as ecotourism operators in Charleston, South Carolina whose business depends on taking trips to view endangered wildlife in its natural habitat in Cape Romain National Wildlife Refuge and surrounding environments. These individuals will likewise be injured if habitat loss is no longer protected under the ESA given the rampant development in coastal areas near Charleston. Plaintiffs' members also include individuals who enjoy observing, studying and/or photographing endangered and threatened species that are imperiled by habitat loss, and these members have specific plans to visit these species' habitats again to continue engaging with them. Two of Plaintiffs' members have worked extensively to protect longleaf pine habitat in the

---

[1] All plaintiff organizations described in paragraphs 12 through 18 above submitted comments in opposition to the Proposed Rescission.

South Carolina Lowcountry and the red-cockaded woodpeckers that depend on these ecosystems. The challenged Rescission would harm these members' interests by allowing rampant future habitat destruction in the rapidly developing coastal areas of South Carolina.

20.    Another member has spent years of her career working on the Savannah Harbor deepening and the protection of the habitat of endangered sturgeon harmed by deepening. With the rescission, she fears the currently planned next deepening will be conducted without mitigation for sturgeon. Another member is a photographer for National Geographic magazine who regularly photographs multiple endangered species throughout the Southeast in their natural habitats. Under this regulatory change, his ability to continue this work, including specific plans to pursue wildlife photography projects in 2026, 2027, and 2028, will be diminished as habitats are no longer protected from threatened destruction. Another member regularly protects threatened red-cockaded woodpeckers by working with property owners to establish safe harbor agreements on their properties. He then conducts research on the woodpeckers protected under these safe harbor agreements. He intends to continue this work, which is his career, in the future. But now this regulatory change will impede his conservation work by essentially eliminating the very program he relies on to preserve and study woodpeckers.

21.    Plaintiff organizations all commented on the Proposed Rule, and are harmed by the agencies' failure to engage in any NEPA process for the challenged rescission. Had the agencies conducted an appropriate NEPA review, Plaintiffs and their members would have participated in the public process, and the outcome of this rulemaking may have been altered.

22.    Finally, the challenged Rescission threatens the development of a number of specific conservation programs and measures, devised pursuant to Sections 7 and 10 of the ESA, that are closely tied to members' species interests. For example, a number of individuals are

8

currently working as part of a dedicated group to establish, or renew, Habitat Conservation Plans that will protect endangered and threatened species from "takes" resulting from ongoing habitat destruction. They plan to continue working to establish and renew these Habitat Conservation Plans, but if habitat destruction and modification is no longer regulated under the ESA, they are concerned that these Habitat Conservation Plans that they have worked so hard to pursue will no longer move forward.

23.     As these examples illustrate, Plaintiffs' members have significant, particularized, and concrete interests in specific endangered and threatened species and their habitats that are and will continue to be injured by the Rescission. Plaintiffs' members also have significant concrete interests in the lawful implementation of NEPA. Plaintiffs and their members would have participated in the NEPA process to promote the thorough consideration of the impacts of the Rescission to these species and their habitats and corresponding alternatives to the proposed action, including alternatives that could have avoided or mitigated such harms. They were denied this opportunity by Defendants' failure to conduct a NEPA analysis and provide a NEPA public comment opportunity during the process. All of these injuries are fairly traceable to the challenged actions and would be redressed if Plaintiffs' requested relief is granted.

**DEFENDANTS**

24.     Defendant United States Fish and Wildlife Service, an agency within the Department of the Interior, is responsible for implementing the requirements of the ESA with respect to endangered and threatened terrestrial and freshwater plant and animal species.

25.     Defendant Doug Burgum is sued in his official capacity as Secretary of the United States Department of the Interior. Mr. Burgum is responsible for the administration of the ESA with respect to endangered and threatened terrestrial and freshwater plant and animal species.

9

26.     Defendant National Marine Fisheries Service, an agency within the Department of Commerce, is responsible for implementing the requirements of the ESA with respect to endangered and threatened marine species and anadromous fish species.

27.     Defendant Howard Lutnick is sued in his official capacity as Secretary of the United States Department of Commerce. Mr. Lutnick is responsible for the administration of the ESA with respect to endangered and threatened marine species and anadromous fish species.

## BACKGROUND

### I.      Endangered Species Act of 1973

28.     "In response to growing concern over the extinction of many animal and plant species, Congress enacted the Endangered Species Act of 1973." *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (citation omitted). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978).

29.     "'The plain intent of Congress in enacting this statute . . . was to halt and reverse the trend toward species extinction, whatever the cost.'" *Sweet Home*, 515 U.S. at  699 (quoting *Hill*, 437 U.S. at 184).

30.     In shaping legislation to achieve this aim, Congress started from the finding that habitat destruction and degradation are the primary drivers of extinction and biodiversity loss. *See Hill*, 437 U.S. at 178–79 (citing legislative history, including H.R. Rep. No. 93-412 (1973) and S. Rep. No. 93-307 (1973)).

31.     Accordingly, the ESA set out not only "to provide a program for the conservation of . . . endangered species and threatened species," but also "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."

10

16 U.S.C. § 1531(b). Congress defined "conservation" and "conserve" to mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3).

32.    "[E]xamination of the language, history, and structure of the [ESA] . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Hill*, 437 U.S. at 174.

33.    In pursuing these objectives, Section 9(a)(1) forms the "cornerstone" of the statute. *Gibbs*, 214 F.3d at 487. Section 9 prohibits the "take" of any endangered species. 16 U.S.C. § 1538(a)(1)(B); *see also id.* § 1533(d) (providing for the regulatory extension of the take prohibition to threatened species); 50 C.F.R. § 17.31(a) (extending the take prohibition to threatened species).

34.    Congress intended "take" to apply "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 93-307, 1973 WL 12683, at *2,995 (1973).

35.    Consonant with that intent, the ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

36.    Congress made clear from the outset that Section 9(a)(1)(B) prohibits a breadth of takings, "whether intentional or not." H.R. Rep. No. 93-412, at 11 (1973).

37.    In addition to the Act's take prohibition, Section 7 requires "[e]ach [f]ederal agency" to "insure" that the actions that it funds, authorizes, or undertakes "[are] not likely to jeopardize the continued existence of any endangered species or threatened species or result in

11

the destruction or adverse modification" of their designated "critical habitat." 16 U.S.C. §

1536(a)(2)(4); *see* 50 C.F.R. pt. 424. To fulfill this substantive mandate, Section 7(a)(2) requires

federal agencies to consult with the Services to determine the effects of federal action on listed

species. 16 U.S.C. § 1536(a)(2).

38.    Section 7's "language admits of no exception." *Hill*, 437 U.S. at 173. Its

procedural and substantive requirements apply to the Services' own actions, including "the

promulgation of regulations." U.S. FWS, ENDANGERED SPECIES CONSULTATION HANDBOOK app.

E (1998); 50 C.F.R. § 402.02.

39.    Through these provisions, the ESA has protected listed wildlife for over fifty

years from habitat destruction and degradation. As the Services themselves have recognized,

such habitat destruction threatens the survival and recovery of the vast majority of endangered

and threatened species.

## II.    The Harm Definition[2]

40.    In keeping with Congressional intent, the Services since 1973 have consistently

implemented Section 9, governing the "take" of listed species, to prohibit significant habitat

modification and degradation that kills or injures endangered or threatened wildlife.

41.    To codify this approach to Section 9, FWS proposed and then promulgated the

original definition of "harm" in 1975, just eighteen months after the Act was passed. *See*

Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44412, 44413

(Sept. 26, 1975) (codified at 50 C.F.R. pt. 17).

---

[2] Because the Services have indicated that they consider their respective regulatory definitions of "harm" to be "materially identical," Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16,102, 16,103 (proposed Apr. 17, 2025), they are collectively referred to in this Complaint as the "Harm Definition," except as otherwise specified.

42.     When it promulgated the harm definition, FWS explained that the definition was consistent with the Act's emphasis on "the habitat needs of listed species": "Congress specifically acknowledged these needs by stating . . . '[t]he purposes of this Act are to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved[.]'" *Id.* (quoting 16 U.S.C. § 1531(b)). The 1975 regulation included the core concepts that remained for fifty years: harm was defined as "an act which actually injures or kills wildlife," which "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (1975).

43.     In 1981, FWS clarified the definition to confirm that the requirement of actual death or injury applied to habitat modification. Endangered and Threatened Wildlife and Plants; Final Redefinition of "Harm," 46 Fed. Reg. 54,748 (Nov. 4, 1981) (codified at 50 C.F.R. pt. 17). In making this clarification, FWS retained an explicit reference to harm from habitat modification and degradation. *Id.* at 54,749. The 1981 FWS definition read: "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* at 54750.

44.     In promulgating this clarification of its definition of "harm," FWS emphasized that "Congress made its intent to protect species and their habitat very clear" and "intended to create a definition of take which included all of the various ways of killing or injuring protected wildlife." *Id.* at 54,749.

13

45.     FWS's harm definition remained unchanged for over forty-four years, until the Services' Rescission of the Harm Definition in 2026.

46.     NMFS adopted a substantially similar definition of harm in 1999. Endangered and Threatened Wildlife and Plants; Definition of "Harm," 64 Fed. Reg. 60,727, 60,727 (Nov. 8, 1999) (codified at 50 C.F.R. pt. 222). The NMFS definition read: "Harm in the definition of 'take' in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." *Id.* at 60,731.

47.     NMFS emphasized that the definition was "not a change in existing law" but rather sought to affirm that NMFS's "interpretation of harm is consistent with that of FWS." *Id.* at 60,727. NMFS further emphasized that the definition effectuated a "Congressional intent to protect the habitats of listed species." *Id.*

48.     NMFS's harm definition likewise remained unchanged until the Services' Rescission of the Harm Definition in 2026.

**III.     The 1982 Amendments to the ESA**

49.     In 1982, shortly after FWS affirmed the key elements of its harm definition, Congress amended the ESA.

50.     To resolve "potential conflicts between endangered species and the actions of private developers," S. Rep. No. 97–418, at 10 (1982), Congress established a permitting scheme for "incidental" take, i.e. "any taking otherwise prohibited by [Section 9(a)(1)(B)] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," 16 U.S.C. § 1539(a)(1)(B). Under Section 10(a), the Services may issue permits for incidental take

14

pursuant to certain requirements, including a habitat conservation plan that minimizes and mitigates the impact of such take. *See id.* § 1539(a)(2).

51.    Congress also added a mechanism to address incidental take under Section 7. *See* H.R. Conf. Rep. 97-835, at 27 (1982). If, during the Section 7 consultation process, either of the Services concludes that a federal action will take a species without jeopardizing its existence, then it must provide an incidental take statement authorizing the anticipated incidental take. 16 U.S.C. § 1536(b)(4), (o)(2). The incidental take statement must specify the amount or extent of incidental take as well as measures to monitor and mitigate such take. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i), (iv). Consultation must be immediately reinitiated if the amount or extent of incidental taking is exceeded. *Id*. §§ 402.14(i)(4), 402.16(a).

52.    In making these amendments, Congress operated from the understanding that Section 9(a)(1)(B) "prohibits the taking of any endangered fish or wildlife, *including harm which may occur as a result of habitat modification*." S. Rep. No. 97–418, at 26 (1982) (emphasis added). Indeed, Congress expressly modeled the Section 7 and 10 permitting schemes after a situation involving incidental take in the form of habitat modification. *See id.* at 10; H.R. Conf. Rep. No. 97-835, at 30–32 (1982).

**IV.       *Babbit v. Sweet Home Chapter of Communities for a Great Oregon***

53.    The Supreme Court reviewed and upheld FWS's harm definition in 1995, in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995).

54.    In its analysis, the Court concluded that the express purposes of the ESA support an interpretation that includes habitat modification within the definition of harm. The Court recognized in *TVA v. Hill*, and again in *Sweet Home*, that the Act is "the most comprehensive

15

legislation for the preservation of endangered species ever enacted by any nation." *Sweet Home*, 515 U.S. at 698 (quoting *Hill*, 437 U.S. at 180).

55.    The Court specifically noted that among the central purposes of the Act is "provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* (quoting 16 U.S.C. § 1531(b)). Reading "harm" to encompass habitat modification and degradation that actually kills or injures listed species, the Court reasoned, is thus consistent with Congress' intent in enacting the ESA. *Id.* at 699.

56.    The Court further explained that the ordinary understanding of "harm" supported the definition. *Sweet Home*, 515 U.S. at 697. Harm means to "cause hurt or damage to: injure." *Id.* According to the Court, this clearly includes habitat modification that *actually kills or injures* wildlife. *Id.*

57.    The Court also considered the Section 10 permitting scheme for incidental take. The Court reasoned that "[n]o one could seriously request an 'incidental' take permit to avert § 9 liability for direct, deliberate action against a member of a[] [listed] species." *Id.* at 700–01. Thus, Congress must have understood that even "activities not intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary permits them." *Id*. at 701.

58.    Turning to legislative history, the Court noted that the Committee Reports "*make clear* that Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions." *Id.* at 704 (emphasis added). "The Senate Report stressed that '"take" is defined . . . *in the broadest possible manner to include every conceivable way in which a person can "take"* or attempt to "take" any fish or wildlife.'" *Sweet Home*, 515 U.S. at 704 (emphasis added) (quoting S. Rep. No. 93-307, at 7 (1973)). Similarly, the House Report noted that "'the *broadest possible*

16

terms' were used to define restrictions on takings." *Id*. (emphasis added) (quoting H.R. Rep. No. 93-412, at 15 (1973)).

59.     Although the Court's analysis was conducted under the then-governing judicial standard, *Chevron* deference, under which federal courts deferred to reasonable agency interpretations of statutory language, *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), the Court nonetheless conducted a thorough investigation, utilizing traditional tools of statutory interpretation, to determine Congress' intent in enacting the Act.

60.     Based on this thorough analysis of the Act, the *Sweet Home* Court reached two conclusions. First, the Court rejected the contention that the Act limits harm to direct, deliberate actions against endangered or threatened wildlife. *Sweet Home*, 515 U.S. at 707. Second, the Court held that the text, structure, purpose, and legislative history of the Act supported including habitat modification and degradation in the definition of harm.

61.     Following the *Sweet Home* decision, the Services and the courts continued to apply the ESA's take prohibition to habitat destruction. The approach that began with the passage of the Act over twenty years prior thus remained unchanged for another thirty years.

## V.     The 2026 Recission of the Harm Definition

### a.  The Proposed Rule

62.     On April 17, 2025, the Services proposed to rescind their definitions of "harm" under the ESA, including the 1981 definition that the Supreme Court upheld.

63.     The Services asserted that the Harm Definition ran "contrary to the best meaning of the statutory term 'take.'" *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102, 16102 (proposed Apr. 17, 2025) (to be codified at 50 C.F.R. pts. 17, 222).

17

64.     Without addressing the *Sweet Home* majority's analysis, the Services focused on the decision's application of *Chevron* deference, the operative standard of review at the time the Supreme Court upheld the Harm Definition. The Services asserted that they were compelled to revisit the Harm Definition in light of the Supreme Court's recent overruling of *Chevron* in *Loper Bright Enterprises v. Raimondo*, which held that, rather than deferring to agency interpretation, the courts should determine the single "best" meaning of statutory language. 603 U.S. 369, 400, 412 (2024). However, the Supreme Court itself emphasized that *Loper Bright* does not "call into question prior cases that relied on the *Chevron* framework." *Id.* at 412. Rather, "[t]he holdings of [cases that applied *Chevron*] that specific agency actions are lawful," including *Sweet Home*'s upholding of the Harm Definition, "are still subject to statutory *stare decisis* despite [the Court's] change in interpretive methodology." *Id.*

65.     Throughout the Notice of Proposed Rulemaking, the Services repeatedly conveyed their unequivocal refusal to recognize habitat modification as "harm" under the ESA, a departure from their decades-old policy. However, they declined to promulgate a new definition. Instead, the Services asserted that their new policy would "rest on the statutory definition of 'take.'" *Id.* at 16103.

66.     Over 350,000 comments were submitted in response to the Proposed Rule. These included detailed comments from numerous states, scientists, small business owners, and environmental organizations, including Plaintiffs, opposing the Rescission.

**b.  The Final Rule**

67.     On July 14, 2026, the Services promulgated the Final Rule rescinding their regulatory definition of "harm" under the Endangered Species Act. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43,300 (July 14, 2026)

18

(codified at 50 C.F.R. pts. 17, 222); *see also* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16,102 (proposed Apr. 17, 2025) (to be codified at 50 C.F.R. pts. 17, 222).

68.    The Final Rule explicitly adopts an interpretation that "take," including the word "harm," "applies only to an 'affirmative act[] . . . directed immediately and intentionally against a particular animal . . . .'"

69.    This rule is the culmination of an April 17, 2025 proposed rulemaking. Consistent with its approach in the Proposed Rule, in the Federal Register notice published with this final rulemaking, the Services indicated that they will now be reinterpreting "harm" in a way that completely reverses their longstanding regulatory interpretation of the term and runs counter to fifty years of consistent agency implementation and Supreme Court precedent.

   c.   **The Final Rule's Approach to NEPA.**

70.    The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et. seq.*, "declares a national policy of protecting and promoting environmental quality." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). Among other things, NEPA requires federal agencies to prepare a "detailed" Environmental Impact Statement that discusses the environmental effects of, and a range of reasonable alternatives to, any "major Federal action[] significantly affecting the quality of the human environment" before undertaking such an action. 42 U.S.C. § 4332(2)(C). The fundamental purpose of the statute is to ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken, and that public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. *Id.* § 4321. As a preliminary step, an agency may first prepare an

environmental assessment ("EA") to determine whether the effects of an action may be significant. 42 U.S.C. § 4336(b)(2).

71.    In limited circumstances, a "categorical exclusion" to NEPA analysis may be invoked for certain "categor[ies] of actions that a Federal agency has determined normally do[] not significantly affect the quality of the human environment within the meaning of [NEPA]." 42 U.S.C. § 4336e(1); *see* 42 U.S.C. § 4336(a)(2); 43 C.F.R. § 46.205. These categories must be listed by agencies in their NEPA implementing regulations or procedures before they may be invoked. 42 U.S.C. §§ 4336(a)(2); 4336c.

72.    The Harm Definition helped protect hundreds of endangered and threatened species from habitat loss and yielded environmental benefits that extended far beyond listed species. As such, the Services' Rescission of the Harm Definition is a major federal action that will significantly affect the quality of the human environment under NEPA and requires environmental review. The Services, however, prepared no NEPA analysis for the Rescission.

73.    Instead, the Services erroneously claimed that the Rescission was exempted from NEPA review because: (1) the agency action was excluded from review under the NEPA statute as "a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action," 42 U.S.C. § 4336(a)(4); or (2) in the alternative, the action was categorically excluded from NEPA review under Department of the Interior and NOAA categorical exclusions for policies, directives, regulations, and guidelines that are "of an administrative, financial, legal, technical, or procedural nature" or for which "the environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 91 Fed. Reg. at 43,316; *see* 43 C.F.R. § 46.210(i);

20

NAT'L OCEANIC & ATMOSPHERIC ADMIN., POLICY & PROCEDURES FOR COMPLIANCE WITH NEPA & RELATED AUTHORITIES app. A, G7 (2025) ("CM").

74.     The Services also failed to explain their assertion that the ESA "compelled" a change in the Harm Definition, despite the 1995 Supreme Court decision to the contrary.

75.     As detailed above, the Rescission is not a ministerial action with minimal environmental effects. To the contrary, the Rescission will reverse decades of habitat protections for numerous species and fundamentally alter the Services' implementation of Sections 7, 9, and 10 of the ESA. The Services offered no reason to believe that these impacts could not be meaningfully analyzed, and gave no indication that the impacts of the Rescission would ever be subject to future NEPA analysis.

76.     Additionally, the Services ignored extraordinary circumstances that, even if the Rescission could otherwise be covered by a categorical exclusion, required the preparation of an EA or EIS here. Before deciding whether a categorical exclusion is appropriate for an action, the Services are legally required to evaluate whether the action involves extraordinary circumstances such that it may have a significant environmental effect and require additional analysis. 43 C.F.R. § 46.205(c); CM 9.  Extraordinary circumstances include significant impacts on endangered or threatened species or their critical habitats, as well as significant impacts on ecologically critical areas or unique environmental risks. *See* 43 C.F.R. § 46.215; CM 9.

77.     Despite the obvious impacts of rescinding a regulation that has protected hundreds of listed species for decades, the Services refused to acknowledge the presence of extraordinary circumstances here.

21

78.    Relying on the above, the Services did not analyze any of the environmental impacts of slashing the extent of habitat protection that hundreds of endangered and threatened species receive under the ESA.

**VI.    Judicial Review Under the Administrative Procedure Act**

79.    The APA, 5 U.S.C. §§ 551 *et seq.*, "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Mass.*, 505 U.S. 788, 796 (1992).

80.    Under the APA, a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  The APA directs reviewing courts to "hold unlawful and set aside" agency actions that are "without observance of procedure required by law" or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)(D).

81.    "[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

82.    "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

83.    When agencies "change their existing policies," they must, at minimum, acknowledge the change, "provide a reasoned explanation," and "show that there are good reasons for the new policy." *Id.*; *see N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (policy changes "cannot be solely a matter of political winds and currents," but rather require "fidelity to law and legal process.").

84.    And when the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Failure to do so is arbitrary and capricious. *Id.*

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the APA – Arbitrary and Capricious Policy Reversal**

85.    The allegations of the preceding paragraphs are incorporated here by reference.

86.    The Services abruptly abandoned a policy that they had consistently implemented since the passage of the ESA more than fifty years ago, codified shortly thereafter, and successfully defended before the Supreme Court more than thirty years ago.

87.    In rescinding their longstanding Harm Definition, the Services failed to address any of the factual underpinnings of the Harm Definition. In doing so, the Services ignored longstanding expert recognition of the harms of habitat destruction.

88.    The Services also failed to take into account their over fifty years of experience administering the Act consistent with the Harm Definition. The Services did not identify any

23

changes in facts or circumstances that would support deviating from the way they have implemented the Act for over five decades.

89.    Furthermore, the Services entirely failed to consider an important aspect of the problem: how the Rescission and new interpretation would severely compromise their ability to fulfill the ESA's mandate "to conserve endangered and threatened species" and "utilize their authorities in furtherance of the [Act's] purposes," including "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. §§ 1531(b), (c)(1); 1532(3).

90.    For example, the Services failed to consider how the endangered and threatened species they are charged with conserving would be affected by their decision to disregard an entire category of harm under the ESA. In doing so, the Services ignored extensive evidence in the record indicating that habitat destruction is the leading cause of extinction and a key factor in the listing and/or recovery of many endangered and threatened species.

91.    The Services further ignored how restricting harm to acts "directed immediately and intentionally against a particular animal" would impact the ESA programs they administer that are premised on the concept of incidental take.

92.    Such programs include incidental take permits and habitat conservation plans issued under Section 10, 16 U.S.C. § 1539(a)(1)(B); incidental take statements issued pursuant to Section 7 consultation, *id.* § 1536(b)(4); and conservation benefit agreements, including agreements formerly known as safe harbor agreements, also issued under Section 10*, id.* § 1539(a)(1)(A).

93.    Without any meaningful attempt to address these underlying factual circumstances, reliance interests, and impacts on their ability to fulfill the ESA's conservation

24

mandate, the Services simply declared, without a rational explanation, that their over fifty-year-old understanding of harm is "legally incorrect." The Services entirely ignored the fact that the Supreme Court, in *Sweet Home*, already found the Harm Definition is legally correct as it is entirely consistent with and supported by the history, structure, and intent of the ESA.

94.     The Services' attempt to excuse their arbitrary dismissal of the *Sweet Home* majority's thorough legal analysis with an appeal to *Loper Bright* only ignores the Supreme Court yet again: the *Loper Bright* Court explicitly emphasized that its decision did "not call into question prior cases that relied on the *Chevron* framework." 603 U.S. 369, 412 (2024).

95.     The Services' new policy also contradicts the text, structure, purpose, and legislative history of the ESA, all of which establish that prohibited take includes killing or injuring listed species via habitat modification.

96.     Additionally, the Services arbitrarily dismissed how the Rescission would harm reliance interests by disrupting a fifty-year-long, stable regulatory framework on which numerous entities and organizations rely.

97.     Because the Rescission "disregard[s] facts and circumstances that underlay" the Services' over fifty-year-old Harm Definition and the "serious reliance interests" it engendered, the APA required the Services to provide a "more detailed justification" for their policy reversal. *Fox*, 556 U.S. at 515-16. The APA also required the Services to consider important aspects of the problem, including how the change would undermine the conservation of the endangered and threatened species they are charged with conserving under the ESA. *See State Farm*, 463 U.S. at 43 ("[A]n agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem."). Because the Services failed to provide the requisite "more detailed justification," failed to demonstrate that their new policy is consistent

25

with the governing statute, acted not in accordance with law and entirely ignored an important aspect of the problem, the Final Rule is arbitrary and capricious.

## SECOND CLAIM FOR RELIEF

### Violation of NEPA – Failure to Analyze Environmental Impacts

98.    The allegations of the preceding paragraphs are incorporated here by reference.

99.    The Services abandoned longstanding habitat protections for hundreds of endangered and threatened species without analyzing any of the environmental consequences.

100.    Neither of the Services' proffered rationales excuse their failure to conduct NEPA analysis.

101.    The Rescission does not qualify for the categorical exclusions that the Services have invoked because it is not a ministerial action and will not be covered by further NEPA analysis. Furthermore, even if the Rescission fell under the categorical exclusion, it presents extraordinary circumstances that require NEPA analysis, such as significant impacts to endangered and threatened species, their critical habitats and ecologically critical areas as well as unique environmental risks. *See* 43 C.F.R. §§ 46.205(c)(1), 46.215; CM 9.

102.    The Rescission also does not qualify as a nondiscretionary action. The Supreme Court already upheld FWS' harm definition in 1995; the Services cannot reasonably claim they are legally obligated to change it.

103.    Contrary to the Services' assertions, the Rescission is a discretionary change in policy that will have significant environmental effects. It seeks to deprive hundreds of endangered and threatened species of the protection that the ESA has provided against death and injury caused by habitat destruction, the leading driver of extinction, for over fifty years. The Rescission would undermine the protective Section 10 habitat conservation plan framework and

26

decrease the effectiveness of Section 7 incidental take statements. In doing so, it would fuel unmitigated habitat loss among endangered and threatened species and impose reverberating environmental consequences for co-occurring species and human communities. Thus, the Rescission is a "major Federal action[] significantly affecting the quality of the human environment" that requires a full Environmental Impact Statement. 42 U.S.C. § 4332(2)(C).

104.    By classifying the Rescission as a nondiscretionary action and applying an inapposite categorical exclusion, the Services violated NEPA and their own implementing regulations and guidance, 42 U.S.C. § 4336; 43 C.F.R. § 46.215; CM 4–5, and they acted arbitrarily and capriciously under the APA, 5 U.S.C. § 706(2)(A). The Services' failure to prepare an Environmental Impact Statement is also arbitrary and capricious and in violation of NEPA, the FWS and NMFS regulations and guidelines implementing NEPA, and the APA, 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332; 43 C.F.R. §§ 46.205(c)(1), 46.215; CM 9.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

(A)    Declare that the Services acted arbitrarily and unlawfully in promulgating the challenged rule;

(B)    Vacate and set aside the challenged regulation;

(C)    Reinstate the 1981 FWS and 1999 NMFS harm definitions;

(D)    Enjoin the Services from applying or otherwise relying on the challenged regulation;

(E)    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

27

(F)     Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted this 17th day of July 2026.

/s/ Catherine M. Wannamaker
Catherine M. Wannamaker
Fed. ID No. 12577
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, South Carolina 29403
Telephone: (843) 720-5270
cmwannamaker@selc.org

Derb Carter (*pro hac vice forthcoming*)
N.C. Bar No. 10644
Elizabeth Rasheed (*pro hac vice forthcoming*)
N.C. Bar No. 55635
Allyson Gambardella (*pro hac vice forthcoming*)
N.C. Bar No. 62371
Southern Environmental Law Center
135 E Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
dcarter@selc.org
erasheed@selc.org
agambardella@selc.org

*Attorneys for Plaintiffs*

28