**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION; SOUTH CAROLINA WILDLIFE FEDERATION; NORTH CAROLINA WILDLIFE FEDERATION; FLORIDA WILDLIFE FEDERATION; LOUISIANA WILDLIFE FEDERATION; ASSOCIATION OF NORTHWEST STEELHEADERS; CONSERVATION COUNCIL FOR HAWAI‘I,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; DOUG BURGUM, in his official capacity as Secretary of the United States Department of the Interior; NATIONAL MARINE FISHERIES SERVICE; HOWARD LUTNICK, in his official capacity as Secretary of the United States Department of Commerce,<br><br>Federal Defendants. | Civil Action No. 2:26-cv-02897-RMG<br><br>**FEDERAL DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1
BACKGROUND ..... 2
I. Endangered Species Act ..... 2
II. Legislative and Regulatory Background of "Take" and "Harm" ..... 3
A. Congress included a "take" prohibition in the 1973 Act. ..... 3
B. The Services' regulatory definition of "harm." ..... 4
C. The Supreme Court's *Sweet Home* Decision. ..... 5
D. The Services' 2026 Rescission of the Harm Rule. ..... 5
STANDARD OF REVIEW ..... 6
ARGUMENT ..... 7
I. The Services properly concluded the rescinded regulation was not consistent with the single, best reading of "take." ..... 7
A. Section 9 prohibits "take"; "harm" is not itself an independent prohibition. ..... 8
B. The definition conflicts with the broader structure of the ESA. ..... 11
C. Congress did not clearly authorize the Services to regulate habitat under the guise of the ESA's "take" prohibition. ..... 13
II. The Services complied with the APA and NEPA. ..... 16
A. The Services provided a reasoned explanation and considered reliance interests. ..... 17
B. The Services complied with NEPA. ..... 19
1. National Environmental Policy Act ..... 20
2. NEPA does not apply because the Services have no discretion to maintain an unlawful regulation. ..... 21
3. If NEPA applies, the Services correctly applied a categorical exclusion. ..... 21
III. Remedy ..... 23
CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alaska Wilderness League v. Jewell*,
788 F.3d 1212 (9th Cir. 2015)........................................ 19, 21

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)........................................ 15

*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993)........................................ 24

*Am. C.L. Union Found. of S.C. v. Stirling*,
123 F.4th 170 (4th Cir. 2024)........................................ 6

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
937 F.3d 559 (D.C. Cir. 2019)........................................ 18

*Appalachian Voices v. DOI*,
25 F.4th 259 (4th Cir. 2022)........................................ 6

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*
515 U.S. 687 (1995)........................................ passim

*Beecham v. United States*,
511 U.S. 368 (1994)........................................ 10

*Betansos v. Barr*,
928 F.3d 1133 (9th Cir. 2019)........................................ 19

*Burrage v. United States*,
571 U.S. 204 (2014)........................................ 19

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002)........................................ 22

*CBOCS W., Inc. v. Humphries*,
553 U.S. 442 (2008)........................................ 7

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026)........................................ 17

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)........................................ passim

*City of Alexandria v. Fed. Highway Admin.*,
756 F.2d 1014 (4th Cir. 1985) ... 22

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ... 22

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ... 19, 21

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ... 18, 19, 24

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ... 22

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ... 7, 18

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ... 17

*FDA v. Wages & White Lion Invs.*,
604 U.S. 542 (2025) ... 18

*Fischer v. United States*,
603 U.S. 480 (2024) ... 9, 10

*Ft. Sumter Tours, Inc. v. Babbitt*,
66 F.3d 1324 (4th Cir. 1995) ... 6

*Geer v. Connecticut*,
161 U.S. 519 (1896) ... 9

*George v. McDonough*,
596 U.S. 740 (2022) ... 9

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ... 12

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ... 15

*INS v. Nat'l Ctr. for Immigrants' Rts.*,
502 U.S. 183 (1991) ... 6

*Jarecki v. G.D. Searle & Co.*,
367 U.S. 303 (1961) ... 9

*Jones v. Hendrix*,
599 U.S. 465 (2023) .......... 12, 13

*Keene Corp. v. United States*,
508 U.S. 200 (1993) .......... 11, 12

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024) .......... passim

*Maryland v. Mullin*,
831 F.Supp.3d 325 (D. Md. 2026) .......... 22

*Morissette v. United States*,
342 U.S. 246 (1952) .......... 9

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*,
964 F.3d 1177 (D.C. Cir. 2020) .......... 7

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) .......... 8

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 24

*Occidental Eng'g Co. v. INS*,
753 F.2d 766 (9th Cir. 1985).......... 6

*Reno v. Flores*,
507 U.S. 292 (1993) .......... 6

*Sackett v. EPA*,
598 U.S. 651 (2023) .......... 13, 15

*San Luis Obispo Mothers for Peace v. NRC*,
100 F.4th 1039 (9th Cir. 2024).......... 22

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......... 20, 21

*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018).......... 24

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) .......... 13

*Sturgeon v. Frost*,
577 U.S. 424 (2016) ........ 11

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 24

*United States v. Salerno*,
481 U.S. 739 (1987) ........ 6

*United States v. Texas,*
599 U.S. 670 (2023) ........ 24

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 16

*Va. Agric. Growers Ass'n v. Donovan*,
774 F.2d 89 (4th Cir. 1985) ........ 6

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........ 14, 16

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ........ 6

*Wilderness Watch v. Mainella*,
375 F.3d 1085 (11th Cir. 2004) ........ 22

**Statutes**

5 U.S.C. § 703 ........ 24

5 U.S.C. § 706 ........ 6

16 U.S.C. § 703(a) ........ 9

16 U.S.C. § 1531 ........ 2

16 U.S.C. § 1531(b) ........ 2

16 U.S.C. § 1532 ........ 12

16 U.S.C. § 1532(15) ........ 2

16 U.S.C. § 1532(19) ........ passim

16 U.S.C. § 1534 ........ 12

16 U.S.C. § 1536(a)(2) ........ 3, 12

16 U.S.C. § 1536(b)(3)(A) ........ 3

16 U.S.C. § 1536(b)(4) ........ 3

16 U.S.C. § 1536(o)(2) ....................3
16 U.S.C. § 1538(a)(1)....................16
16 U.S.C. § 1538(a)(1)(B) .................... 2, 8
16 U.S.C. § 1538(a)(1)(D) .................... 13
16 U.S.C. § 1538(a)(2).................... 2
16 U.S.C. § 1539(a) ....................3
16 U.S.C. § 1539(a)(2) ....................3
16 U.S.C. § 1539(a)(2)(C) .................... 14
16 U.S.C. § 1540.................... 2, 14
16 U.S.C. § 1540(a)(1) .................... 13
16 U.S.C. § 1540(b)(1) .................... 13
16 U.S.C. § 1540(e)(4)(B) ....................13
16 U.S.C. § 1540(f) ....................2
16 U.S.C. § 1540(g) .................... 13
16 U.S.C. § 2402(20) .................... 9
42 U.S.C. § 4336(b)(1)-(2) .................... 20
42 U.S.C. § 4336c .................... 20
42 U.S.C. § 4336e(1) ....................20, 22
42 U.S.C. § 4336e(10)(B)(vii) ....................21
Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884 ....................4

**Constitutional Provisions**

U.S. Const. art. II, § 3 ....................1, 18

**Regulations**

43 C.F.R. § 46.210 .................... 20
43 C.F.R. § 46.210(i) .................... 22, 23
43 C.F.R. § 46.215 .................... 20, 22, 23
43 C.F.R. § 46.215(c).................... 23
43 C.F.R. § 46.215(e).................... 23
43 C.F.R. § 46.215(g) .................... 23

50 C.F.R. § 17.3 .......... 4, 10, 11, 13
50 C.F.R. § 17.11-.12 .......... 2
50 C.F.R. § 222.102 .......... 5, 10 11, 13
50 C.F.R. § 402.01(b) .......... 2

**Legislative Materials**

Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce, 93d Cong., 1st Sess. (1973) .......... 4, 14
S. 1983, 93d Cong., at 31 (July 1, 1973, as reported, with amendments) .......... 3, 15
119 Cong. Rec. 25,669 (1973) .......... 15
119 Cong. Rec. 25,682-83 (1973) .......... 4, 15
119 Cong. Rec. 30,162 (1973) .......... 15

**Administrative and Executive Materials**

40 Fed. Reg. 44412 (Sept. 26, 1975) .......... 4
46 Fed. Reg. 54748 (Nov. 4, 1981) .......... 4
64 Fed. Reg. 60727 (Nov. 8, 1999) .......... 5, 9
90 Fed. Reg. 16102 (Apr. 17, 2025) .......... 5, 22
91 Fed. Reg. 43300 (July 14, 2026) .......... passim

**INTRODUCTION**

The Endangered Species Act regulates the "take" of a listed species. As Justice Scalia explained in his canonical dissent in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, "take" requires an intentional, purposeful act directed against a particular animal. 515 U.S. 687, 714-36 (1995) (Scalia, J., dissenting). "Take" does not refer to actions that modify a listed species' habitat. The majority in *Sweet Home* disagreed, concluding that a habitat-focused definition of "harm"—one of the words used to define "take" in the statutory text—was "reasonable." *Id.* at 697, 703, 708. That construction survived under *Chevron*. But *Chevron* is gone. *Loper Bright Enterprises v. Raimondo* now requires agencies and courts to administer statutes according to their single, best meaning. 603 U.S. 369, 400 (2024). And that best reading is *not* the Services' prior regulation the majority deferred to in *Sweet Home*; it is the interpretation set forth by Justice Scalia in the dissent.

Justice Scalia's *Sweet Home* dissent methodically detailed how the ESA's language, structure, and legislative history (to the extent relevant) cut against the Services' reading. *Sweet Home*, 515 U.S. at 714-36 (Scalia, J., dissenting). The nine verbs Congress placed alongside "harm" expand the common-law term only slightly, reaching the process of taking, and attempts. But read with its companions, "harm" still describes an intentional, purposeful act directed at a particular animal. And Congress addressed habitat elsewhere, including in Section 5, which authorizes land acquisition from willing sellers. Congress did not convert a common-law prohibition on "take" into a land-use regulation through a single verb, added without debate.

The Executive Branch must faithfully execute the laws as Congress wrote them. U.S. Const. art. II, § 3. Acting on that duty, the Services initiated rulemaking to reexamine the old definition and concluded that it is not the single, best reading of the ESA. Once they reached that conclusion, the Services had no discretion to leave the regulation in place. The rescission

followed as a matter of law, not policy—and the Services therefore owed no further obligations under the Administrative Procedure Act (APA) or National Environmental Policy Act (NEPA). With the rescission, the Services have restored "take" to what Congress enacted in 1973. The Court should grant summary judgment and dismiss this case.

## BACKGROUND

### I. Endangered Species Act

The ESA, 16 U.S.C. § 1531 et seq., protects "endangered" and "threatened" species. *Id.* § 1531(b). Congress granted the Departments of the Interior and Commerce shared responsibility to implement the ESA, including by promulgating regulations. *E.g.*, *id.* §§ 1533(a), 1533(d), 1540(f). The Secretaries of the Interior and Commerce respectively delegated their responsibilities to FWS, for terrestrial and freshwater species, and to NMFS, for most marine and anadromous species. *See id.* § 1532(15); 50 C.F.R. §§ 17.11-.12, 402.01(b).

The ESA's text explains the contours of these responsibilities. Under ESA Section 9, it is "unlawful for any person subject to the jurisdiction of the United States to take … any [endangered species of fish or wildlife] within the United States[.]" 16 U.S.C. § 1538(a)(1)(B).[1] The ESA imposes civil and criminal penalties for take. *Id.* § 1540(a)-(b). "'[T]ake' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The ESA does not define "harm" or any of the other nine verbs used to define take. ESA Section 7 puts more onerous requirements on the federal government to protect species. It requires "action agencies" to consult with the Services in their capacity as "consulting agencies" to ensure that federal actions are not likely to jeopardize the continued existence of listed

[1] The take prohibition generally prohibits take of animals, not plants. *See* 16 U.S.C. § 1538(a)(2). For threatened species, the Services can extend the "take" and other Section 9 prohibitions by rule. *Id.* § 1533(d).

species or result in the destruction or adverse modification of designated critical habitat. *Id.* § 1536(a)(2). Consultation culminates in a "biological opinion," in which FWS or NMFS examines the proposed action's anticipated effects and opines on whether the action is likely to jeopardize listed species' continued existence or destroy or adversely modify their designated critical habitat. *Id.* § 1536(b)(3)(A). If the agency action will result in take, FWS or NMFS also issues an incidental take statement (ITS) specifying the extent of anticipated take and setting forth terms and conditions for implementation of reasonable and prudent measures necessary or appropriate to minimize the impact of take. *Id.* § 1536(b)(4). Take is not prohibited when in compliance with the terms and conditions of an ITS. *Id.* § 1536(o)(2). Further, under Section 10, the Services may issue incidental take permits (ITP) for applicants otherwise engaged in lawful activity. *Id.* § 1539(a). An ITP applicant must prepare a conservation plan demonstrating the applicant will minimize and mitigate the impacts of take to the maximum extent practicable, identifying funding for such measures, and showing that permitted take will not appreciably reduce the survival and recovery of the species. *Id.* § 1539(a)(2).

## II. Legislative and Regulatory Background of "Take" and "Harm"

### A. Congress included a "take" prohibition in the 1973 Act.

In 1972, President Richard Nixon asked Congress to enact legislation that would "allow the Federal Government to control shooting, trapping, or other taking of endangered species."[2] Several such bills were introduced and, in 1973, the Senate Committee on Commerce produced a bill defining take as follows: "harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." S. 1983, 93d Cong., at 31 (July 1, 1973, as reported, with amendments). The Committee considered—but did not include—language that would have

[2] Special Message to the Congress Outlining the 1972 Environmental Program (Feb. 8, 1972), *available at* https://www.presidency.ucsb.edu/node/255047.

defined "take" to include actions that harm listed species' habitats. *See* Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce ("Hearings"), 93d Cong., 1st Sess., 27, 86, 108, 116, 146 (1973).

The Committee's bill went to the full Senate, where a floor manager added the word "harm" to the definition of "take," along with two dozen other "technical and clarifying" amendments to the text, all added without debate. 119 Cong. Rec. 25,682-83 (1973). The Senate passed the bill, and the definition of take in the bill was in the ESA as enacted in December 1973; it remains the statutory text today. Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884; *accord* 16 U.S.C. § 1532(19).

**B. The Services' regulatory definition of "harm."**

Notwithstanding Congress' exclusion of habitat-related actions from the definition of "take," in 1975, FWS issued a regulation defining "harm" to include environmental modification or degradation. *See* Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44412, 44416 (Sept. 26, 1975) (defining "harm" as "an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns …; significant environmental modification or degradation which has such effects is included within the meaning of 'harm'").

In 1981, FWS tempered this definition slightly, conceding that Congress "*did not … express any intention to protect habitat under section 9* where there was no appurtenant showing of death or injury to a protected species." Final Redefinition of Harm, 46 Fed. Reg. 54748, 54749 (Nov. 4, 1981) (emphasis added), *codified at* 50 C.F.R. § 17.3. FWS defined harm as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* at 54750. In 1999, NMFS

adopted a substantially similar definition of "harm" as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." Definition of Harm, 64 Fed. Reg. 60727, 60731 (Nov. 8, 1999), *codified at* 50 C.F.R. § 222.102. FWS's 1981 definition, and NMFS's 1999 adoption of it, stayed in place until the Services' recent rescission.

### C. The Supreme Court's *Sweet Home* Decision.

In 1995, applying *Chevron* deference, the Supreme Court upheld the now-rescinded definition of "harm" as "reasonable" or "permissible." *Sweet Home*, 515 U.S. at 697, 703, 708 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The Supreme Court did "not decide whether the statutory definition of 'take' compels the [Services'] interpretation of 'harm,' because [its] conclusions that Congress did not unambiguously manifest its intent … and that the [Services'] interpretation is reasonable suffice to decide this case." *Id.* at 703. Nor did the Court decide whether a narrower reading of "take" was lawful. *See id*. Justice Scalia authored a dissent, explaining that the ESA did not allow for the Services' now-rescinded definition of "harm." *Id.* at 714-36 (Scalia, J., dissenting). Focusing on the text, Justice Scalia explained that the words Congress used to define "take" share "the sense of affirmative conduct intentionally directed against a particular animal or animals." *Id.* at 720. Furthermore, Congress provided separate mechanisms for addressing threats to habitat, such as through Section 7 and the land acquisition program in Section 5. *Id.* at 714, 720.

### D. The Services' 2026 Rescission of the Harm Rule.

In 2025, the Services published a proposed rule to rescind the definition of "harm" from title 50 C.F.R. sections 17 and 222. 90 Fed. Reg. 16102 (Apr. 17, 2025). Tasked with the duty to administer the ESA faithfully, according to its single, best meaning, the Services rescinded the

regulatory definition of "harm" in July 2026. 91 Fed. Reg. 43300 (July 14, 2026); *see Loper Bright*, 603 U.S. at 400.

## STANDARD OF REVIEW

Plaintiffs' claims arise, if at all, under the APA and are properly resolved on the administrative record. 5 U.S.C. § 706; *Ft. Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995); *see also Appalachian Voices v. DOI*, 25 F.4th 259, 268 (4th Cir. 2022). Because review is confined to the record, there are no disputed facts for the Court to resolve; "the function of the district court is to determine whether … as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Summary judgment is therefore the appropriate mechanism for deciding, as a matter of law, whether the agency action survives review. *See Va. Agric. Growers Ass'n v. Donovan*, 774 F.2d 89, 92 (4th Cir. 1985).

Plaintiffs' challenge is facial: they do not challenge any specific application of the rescission of the definition of "harm" to any species, project, or Plaintiff. To prevail, then, they "must establish that no set of circumstances exists under which the [rule] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *accord Am. C.L. Union Found. of S.C. v. Stirling*, 123 F.4th 170, 177 (4th Cir. 2024) (noting general rule for facial challenges). That is "the most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745. Facial challenges are disfavored because they "often rest on speculation" and "run contrary to the fundamental principle of judicial restraint." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). A rule is not facially invalid merely because it "may be invalid as applied in [some] cases." *INS v. Nat'l Ctr. for Immigrants' Rts.*, 502 U.S. 183, 188 (1991). Where a rule survives facial review, the proper course is to uphold it and "preserve the right of complainants to bring as-applied challenges against any alleged unlawful

applications." *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1185 (D.C. Cir. 2020) (citation omitted).

## ARGUMENT

### I. The Services properly concluded the rescinded regulation was not consistent with the single, best reading of "take."

*Loper Bright* overruled *Chevron* and expressly rejected its second step requiring deference to permissible agency interpretations of statutes. The rule restoring the statutory text thus addresses the new test established in *Loper Bright*: whether the prior harm rule represents the "single, best reading" of the ESA's "take" prohibition. 603 U.S. at 400 ("statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning"). The Services concluded it does not and is thus unlawful. *See* 91 Fed. Reg. at 43301.

When overruling *Chevron*, the Court explained that prior decisions applying *Chevron* are governed by statutory *stare decisis*, which means only that the regulation as interpreted is protected from judicial invalidation. *Loper Bright*, 603 U.S. at 412. But *stare decisis* is about judicial respect for holdings of prior cases notwithstanding a change in judicial interpretive methodology. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). It does not prohibit an agency from exercising its own authority to bring its regulations in line with the best reading of a statute. *See Loper Bright*, 603 U.S. at 412. An agency has inherent authority to reconsider its interpretation of statutes, to the extent permitted by law. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). It need not undertake that review. But once it does so, it is bound by the best interpretation of the statute and has no discretion to leave a regulation in place that does not reflect that single, best interpretation. *See Loper Bright*, 603 U.S. at 400. *Loper Bright*'s statutory *stare decisis* language prevents litigants from upsetting settled precedent. It does not permanently prevent the executive branch from conforming its regulations to the best meaning of statutes enacted by Congress.

This case is a prime example. What the Services assert is that they have the authority to

align their regulatory definition of "harm" to the single, best reading of the ESA. And once they have done so, the relevant question is now what the *statute* itself means, not whether the previous regulation under it was permissible. The *stare decisis* value of *Sweet Home* thus simply does not apply. Indeed, even under the old *Chevron* framework, a prior judicial construction of a statute displaced an agency's contrary construction "only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 982 (2005). That is why, in *Sweet Home* itself, there was recognition that "nothing the Court says today prevents the agency itself from narrowing the scope of its regulation at a later date." 515 U.S. at 714 (O'Connor, J., concurring). It would be beyond strange to think that, after *Loper Bright*—a case fundamentally about the need to adhere to the best meaning of the statute passed by Congress—the Government had *less* authority to adopt a reading that reflected the best meaning of the ESA than under *Chevron*. Here, the Services' reconsideration compelled them to rescind a regulation that does not present the best reading of the ESA's "take" prohibition. The Services determined, instead, that Justice Scalia's interpretation in the *Sweet Home* dissent was the best reading of the statute. 91 Fed. Reg. at 43301.

### A. Section 9 prohibits "take"; "harm" is not itself an independent prohibition.

Section 9 makes it unlawful for any person to "take" an endangered species. 16 U.S.C. § 1538(a)(1)(B). The ESA's operative prohibition is not "harm." That instead appears as one of ten verbs by which Congress defined "take." *Id.* § 1532(19). The distinction is not a formality: a complaint or an indictment alleging that a defendant "harmed" a listed species would state no claim and charge no offense. The allegation must be that he *took* one. *Sweet Home*, 515 U.S. at 717 (Scalia, J., dissenting). "Harm" must therefore be construed as Congress used it—a description of one way in which a person may take a protected animal.

"Take" is among the older terms of art in Anglo-American law. Applied to wild animals it has meant, for centuries, to reduce an animal to human control by killing or capturing it. *Geer v. Connecticut*, 161 U.S. 519, 523 (1896); *Sweet Home*, 515 U.S. at 717 (Scalia, J., dissenting) ("If 'take' were not elsewhere defined in the [ESA], none could dispute what it means, for the term is as old as the law itself."). Congress used the word that way in wildlife legislation before and after 1973. *See, e.g.*, Migratory Bird Treaty Act, 16 U.S.C. § 703(a); Antarctic Conservation Act, 16 U.S.C. § 2402(20). When Congress borrows a term carrying accumulated legal content, it "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Morissette v. United States*, 342 U.S. 246, 263 (1952); *accord George v. McDonough*, 596 U.S. 740, 746 (2022). Nothing in the ESA signals a departure. Congress's elaboration—nine additional verbs, every one describing affirmative conduct directed toward an animal—confirms the borrowed meaning rather than displaces it.

The rescinded regulation reached a different conclusion. It recast "harm" as markedly different from the nine verbs beside it by providing that any significant habitat modification that in fact killed or injured wildlife (including "impairing essential behavioral patterns," such as "breeding, spawning, rearing, migrating, feeding or sheltering," *see* 64 Fed. Reg. at 60731), without regard to whether any person took any action directed at any animal, constituted a take. That difference violates *noscitur a sociis*, under which "a word is known by the company it keeps." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). The canon is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Id.*; *see also Fischer v. United States*, 603 U.S. 480, 487 (2024).

That canon is especially instructive here, where "harm" sits among verbs that share a common thread: "harass, [] pursue, hunt, shoot, wound, kill, trap, capture, or collect" refer to affirmative conduct *against an animal*. 16 U.S.C. § 1532(19). Not one of these verbs describes the

alteration of a landscape; not one refers to conduct that never touches, targets, or approaches any animal at all. *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). "Harm" therefore shares that same common thread as the other nine verbs. But, by reaching "habitat modification or degradation" which "kills or injures wildlife by significantly impairing essential behavioral patterns," 50 C.F.R. §§ 17.3, 222.102 (2025), the prior regulation created a prohibition under which a defendant may "take" a species he never pursues, targets, or touches. Whatever else "take" means, it does not mean that. An example used by the Supreme Court in *Fischer* is particularly instructive:

> A zoo might post a sign that reads, "do not pet, feed, yell or throw objects at the animals, or otherwise disturb them." If a visitor eats lunch in front of a hungry gorilla, or talks to a friend near its enclosure, has he obeyed the regulation? Surely yes. Although the smell of human food or the sound of voices might well disturb gorillas, the specific examples of impermissible conduct *all involve direct interaction with and harassment of the zoo animals*. Merely eating or talking is so unlike the examples that the zoo provided that it would be implausible to assume those activities were prohibited, *even if literally covered by the language*.

603 U.S. at 487-88 (emphasis added).

So too here. While habitat modification may well have adverse impacts on a species, unlike the other actions defining take, it does not involve an action *directed at an animal*. Each of the other verbs denotes immediacy: A (actor) impacts B (animal). By contrast, the rescinded definition of "harm" indicates a proximity two steps removed, such that A (actor) impacts B (habitat), which in turn impacts C (behavioral pattern of a species). The other nine words would not be used to describe an ordinary action—like a farmer clearing his land—that results in an indirect and unintended impact on a species.

As Justice Scalia recognized in his *Sweet Home* dissent, these significant differences demonstrate that the rescinded definition of "harm" is flawed because it should reflect the same attributes shared by the list of words around it. *See* 515 U.S. at 720-21 (Scalia, J., dissenting); *see*

*also id.* ("[T]he term 'harm' should be interpreted to include only those actions that are directed against, and likely to injure or kill, individual wildlife." (citation and quotation marks omitted)).

The prior regulatory definition of "harm" also did not make sense when inserted into the statutory definition of "take." The statute defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, *or to attempt to engage in any such conduct*." 16 U.S.C. § 1532(19) (emphasis added). A person can attempt to harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect a wild animal. This is because each of those verbs describes an action purposefully directed at a specific animal. A person could attempt to harm an animal by, for example, feeding an animal poison or spraying it with mace. But no one can attempt the unintended, downstream consequences of habitat modification, as contemplated in the prior regulation. 50 C.F.R. §§ 17.3, 222.102 (2025). A definition that cannot be inserted into the operative text without producing nonsense is not the best reading of that text.

In sum, the single, best reading of the statutory text is that "take" covers only intentional action aimed directly against an animal, and the prior regulation's definition of "harm" exceeds the scope of that reading.

### B. The definition conflicts with the broader structure of the ESA.

Defining "harm" to include habitat modification also violated additional statutory construction principles because Congress explicitly addressed habitat destruction elsewhere in the ESA. *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("Statutory language cannot be construed in a vacuum …. [T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)); *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation omitted)).

Congress addressed that threat expressly in Section 5, enacted at the same time as the definition of "take" and the prohibition on take in Section 9. Section 9, by contrast, never mentions habitat. Under ESA Section 5, the Services "shall establish and implement a program to conserve" listed wildlife by using their land acquisition authorities. 16 U.S.C. § 1534.[3] That choice was deliberate and would be difficult to explain if Congress had already prohibited habitat modification that harms species. *Sweet Home*, 515 U.S. at 727-28 (Scalia, J., dissenting). There would be little incentive for the Services to buy habitat from private landowners if Section 9 itself barred habitat modification or degradation.

And, similarly, Section 7 *expressly* provides a process for federal agencies to consider and address impacts to habitat during the consultation process. 16 U.S.C. § 1536(a)(2). Congress' express inclusion of habitat in the consultation process shows that Congress acted intentionally by omitting habitat modification or degradation from the definition of take. *See Keene Corp.*, 508 U.S. at 208; *Sweet Home*, 515 U.S. at 723-24 (Scalia, J., dissenting) ("[I]t would be passing strange for Congress to carefully define 'critical habitat' as used in [Section 7], but leave it to the [Services] to evaluate, willy-nilly impermissible 'habitat modification' (under the guise of 'harm'….").

Furthermore, the ESA must be "interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995). Section 3 defines "take" "[f]or the purposes of this chapter," and the definition must work wherever Congress used the word. 16 U.S.C. § 1532. Courts must "construe [related provisions] in harmony, not set them at cross-purposes," and should "resist attributing to Congress an intention to render a statute so internally inconsistent." *Jones v. Hendrix*,

[3] Section 5 is one of the authorities on which FWS relied to expand the Florida Panther National Wildlife Refuge, for example.

599 U.S. 465, 478-79 (2023). The "harm" regulation conflicts with the way "take" is used throughout other parts of the ESA. Section 9 outlaws the possession, sale, delivery, and transport of "species taken in violation" of the ESA (for example, hunting trophies or furs from endangered animals), which makes no sense in the context of unidentified animals "taken" by habitat modification. 16 U.S.C. § 1538(a)(1)(D). Also, in Section 11(e), Congress provided for the forfeiture of "[a]ll guns, traps, nets, and other equipment … used to aid the taking" of a protected species. *Id.* § 1540(e)(4)(B). Habitat modification is not done by "guns, traps, and nets" but by plows, bulldozers, and backhoes. Yet those items are not on Congress' list of equipment used to aid the taking of protected species.

The now-rescinded rule was inconsistent with the structure of the statute and created inconsistencies in Congress' carefully drawn regulatory scheme and, thus, was not the best reading of the statute.

### C. Congress did not clearly authorize the Services to regulate habitat under the guise of the ESA's "take" prohibition.

The Services' prior regulation also falters for a more fundamental reason. Traditionally, land use is a state concern, and federal authority working "a significant impingement of the States' traditional and primary power over land and water use" requires clear congressional authorization. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001); *see also Sackett v. EPA*, 598 U.S. 651, 679-80 (2023). The prior harm regulation was a nationwide land-use control that lacked clear congressional authorization.

The rescinded definition reached essentially every acre of occupied habitat in the United States, and it imposed that control through a prohibition enforceable by civil and criminal penalties and private citizen suit, thereby burdening landowners. *See* 16 U.S.C. § 1540(a)(1), (b)(1), (g). A landowner whose use of his own property would impair a species' "essential behavioral patterns," 50 C.F.R. §§ 17.3, 222.102 (2025), may have needed an incidental take permit to provide take

coverage, and obtaining such a permit required a detailed conservation plan, public comment, and agency findings on the sufficiency of mitigation and funding. Absent a permit, or upon its revocation, he faced civil and criminal liability. 16 U.S.C. §§ 1539(a)(2)(C), 1540. The result was that "a large number of routine private activities—for example, farming, ranching, roadbuilding, construction and logging—[could be] subjected to strict-liability penalties when they fortuitously injure protected wildlife, no matter how remote the chain of causation and no matter how difficult to foresee (or to disprove) the 'injury' may be." *Sweet Home*, 515 U.S. at 721-22 (Scalia, J., dissenting).

Including "harm" in the definition of "take" is nowhere "close to the sort of clear authorization required" to justify the Services' prior regulation directly regulating land-use activities nationwide. *See West Virginia v. EPA*, 597 U.S. 697, 732 (2022). The legislative history, to the extent relevant, confirms Congress had no intent to transform the prohibition on "take" into a land use prohibition. *See Sweet Home*, 515 U.S. at 726 (Scalia, J., dissenting) ("Even if legislative history were a legitimate and reliable tool of interpretation (which I shall assume in order to rebut the Court's claim); and even if it could appropriately be resorted to when the enacted text is as clear as this; here it shows quite the opposite of what the Court says." (citation omitted)).

In 1973, the Subcommittee on Environment of the Senate Committee on Commerce held hearings on two competing bills. *See* Hearings at 3-49. The first, S. 1592, defined "take" as "pursue, hunt, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* at 7. The second, S. 1983, defined "take," for fish or wildlife, as "to threaten, harass, hunt, capture, or kill, or attempt to threaten, harass, hunt, capture, or kill; *or the destruction, modification, or curtailment of its habitat or range*." *Id.* at 27 (emphasis added). The Subcommittee received statements pointing out the difference between the take prohibitions in the competing bills. *Id.* at 86, 108, 116, 146. One statement put it succinctly: "The definition of 'take'

should include 'the destruction, modification, or curtailment of habitat .... This concept is included in S. 1983, but is absent from S. 1592." *Id.* at 146.

Within days of the hearings, the Senate Committee on Commerce produced a "clean" bill, which adopted a cleaned-up version of S.1592's definition of "take," with one addition: the word "harass." *Id.* at 145-46; S. 1983, 93d Cong., at 31 (July 1, 1973, as reported, with amendments) ("'Take' means to harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). The Committee was keenly aware that one definition provided that "take" included habitat destruction and one did not; in the version the Committee sent to the Senate, there was no mention of habitat in the definition of "take." *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975) (rejecting construction of statute that would implement substance of provision that committee rejected).

Nor was the addition of the word "harm" the product of deliberation over the scope of Section 9; it was added on the Senate floor, without debate, as one of twenty-four amendments described as technical and clarifying. 119 Cong. Rec. at 25,682-83. "[I]t would be odd indeed if Congress had tucked an important expansion" of federal authority over private land "into convoluted language in a relatively obscure provision." *Sackett*, 598 U.S. at 677. Moreover, on the floor of the Senate, one of the floor managers explained that the bill would address two problems facing endangered species in different ways: habitat destruction would be remedied by a federal land acquisition provision; and "predation by man for commercial, sport, consumption, and other purposes" would be remedied by the prohibition on take. 119 Cong. Rec. 25,669 (1973); *see also id.* at 30,162 (similar statement on House version of bill).

Against that legislative backdrop, the rescinded regulation is a paradigm of the "transformative expansion" in regulatory authority the Court has viewed with skepticism. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Neither the definition of take in Section 3 nor the prohibition on take in Section 9 contains language referencing habitat, let alone purporting to regulate private land use. 16 U.S.C. §§ 1532(19), 1538(a)(1). Yet the rescinded definition transformed the take prohibition from one regulating conduct directed against protected animals into one regulating the use of private property—an "extraordinary grant of regulatory authority" for which the statute supplies no "clear congressional authorization." *West Virginia*, 597 U.S. at 723-24 (citation modified). Had Congress meant the take prohibition to reach habitat modification, it would have said so; instead, it rejected such a definition.

The rescinded definition was not the single, best reading of that text, and the Services were right to withdraw it. The Court therefore should grant summary judgment in favor of Federal Defendants and dismiss this case.

**II. The Services complied with the APA and NEPA.**

The Services complied with the APA by providing a reasoned explanation for rescinding the harm rule: the former definition of "harm" did "not match the single, best meaning of the statute." 91 Fed. Reg. at 43301. While courts can apply *stare decisis* when reviewing regulations upheld under a *Chevron* framework, "[n]othing in *Loper Bright* prohibits the *executive branch* from reevaluating prior statutory interpretations to ensure compliance with the statute's text." *Id.* at 43313 (emphasis added); *see Loper Bright*, 603 U.S. at 412. "[T]he Court left open the possibility that the executive branch could itself depart from regulations that do not match the single, best meaning of the statute …." 91 Fed. Reg. at 43302. And, once the Services initiated rulemaking to consider the statutory text, they were compelled to rescind the definition of "harm" because it did not reflect the single, best reading of the statute, as discussed *supra* in Argument I.

*Loper Bright*, 603 U.S. at 400. And, because the Services lacked discretion to keep an unlawful regulatory definition, the agencies had no obligations under NEPA.

**A. The Services provided a reasoned explanation and considered reliance interests.**

The Services offered good reasons to rescind the former "harm" rule. After *Loper Bright*, judicial review of an agency's regulation interpreting a statutory definition is a pure question of statutory interpretation. As the D.C. Circuit recently explained, "there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute. The court's judgment is the final word." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026). Thus, in reviewing Plaintiffs' claim that the Services' rescission was arbitrary and capricious, the only question for the Court is whether the Services correctly determined that the prior rule did not provide the single, best meaning of the statute. *See id.* at 1237-39; *accord Loper Bright*, 603 U.S. at 399-401.

Arbitrary and capricious review simply "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project,* 592 U.S. 414, 423 (2021). But under *Loper Bright*, the reviewing court "independently interprets the statute and effectuates the will of Congress," "fixing the boundaries of the delegated authority." 603 U.S. at 395 (citation modified). If the Services are right about the definition of "take," then their determination that the prior definition was unlawful is not merely a good reason for the rescission, it is a conclusive one.[4] The Services cannot reasonably maintain an interpretation once they have undertaken a rulemaking and determined it is not the best reading of the statute. To do otherwise would be inconsistent with the Executive Branch's constitutional interest in faithfully executing the laws enacted by Congress.

---

[4] Even if the Court disagrees with the Services' statutory interpretation, or their reading of the precedential effect of *Sweet Home* under *Loper Bright*, that still would not show that the Services' explanation was irrational, as is required to overturn agency action under the APA.

U.S. Const. art. II, § 3.

The agencies also explained their change in position, to the extent they were required to do so. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). A reviewing court considers whether "the agency display[ed] awareness that it is changing position and offer[ed] good reasons for the new policy." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 570 (2025). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television*, 556 U.S. at 515. Here, the Services acknowledged the prior definition, made clear that the rescission was a change in course, and offered reasons for doing so. 91 Fed. Reg. at 43301-02. This is all that was required. *See Fox Television*, 556 U.S. at 515.

As part of their explanation, the Services also "considered reliance interests—including those raised in public comments—in maintaining the existing definition or at least some definition" of "harm." 91 Fed. Reg. at 43302; *see Regents*, 591 U.S. at 33. The Services concluded that, because reliance interests were based on an unlawful interpretation of the statute, they were entitled to no or diminished weight. *E.g.*, 91 Fed. Reg. at 43309. And, notwithstanding the existence of reliance interests, those interests do not "overcome the executive branch's important interest in maintaining and enforcing only lawful regulations." *Id.* This explanation more than satisfies the Services' burden. *Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 578 (D.C. Cir. 2019) (per curiam) (even where serious reliance interests are at stake, the agency need only explain its reasoning); *see also Regents*, 591 U.S. at 32 (agencies may conclude that "reliance interests in benefits [the government] views as unlawful are entitled to no or diminished weight.").

Plaintiffs' claims of reliance fail because their interests in protection of wildlife and

habitats are mere policy disagreements cast as reliance interests, which have no bearing here. 91 Fed. Reg. at 43309; *see Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might accord with good policy." (citation modified)). A party asserting reliance interests must identify "a specific 'reliance interest,'" not a general policy disagreement, and must "identify a specific event or action that he took (or failed to take) in past reliance on" the previous regulatory program. *See Betansos v. Barr*, 928 F.3d 1133, 1144-45 (9th Cir. 2019); *see also Regents*, 591 U.S. at 31 (identifying, as possible reliance interests, specific actions such as choosing where to enroll in school and where to start a family, all in reliance on government program). General claims of interest in the protection of wildlife do not identify any specific event or action taken in reliance on the now-rescinded definition of "harm." Moreover, even if any of these asserted reliance interests were proper reliance interests (instead of policy disagreements), the Services were amply justified in deciding—as they repeatedly explained—that such interests were outweighed by a need to enforce the law as written by Congress.

In sum, the Services were not required to explain why they rescinded a regulatory definition that did not reflect the best reading of the statute as though it were a *policy* change, but in any event, the Services adequately explained their decision and considered reliance interests, properly determining that such interests were entitled to little or no weight.

**B. The Services complied with NEPA.**

Plaintiffs' NEPA claim lacks merit. The Services lack discretion to avoid the correct statutory interpretation of the ESA, no matter the environmental impact of applying the single, best statutory meaning of the ESA. Faithfully executing the ESA is "an action [the Services] could not refuse to perform." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004)). Thus, rescinding the

definition of "harm" required no NEPA analysis.

In the alternative, the Services correctly applied a categorical exclusion to the rule rescissions as actions that are administrative, legal, and procedural in nature. *See* 43 C.F.R. § 46.210. Having recognized their prior definition of "harm" was inconsistent with the best meaning of the ESA, the Services removed them. That action fits within the CE because it achieves realignment with the statute; it is not an authorization or restriction of any physical change to the environment. For that reason, the Services also correctly determined that extraordinary circumstances do not apply. AR0038; 43 C.F.R. § 46.215.

**1. National Environmental Policy Act**

NEPA "is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). It "is a procedural cross-check, not a substantive roadblock." *Id.* "NEPA does not mandate particular results, but simply prescribes the necessary process for an agency's environmental review of a project." *Id.* at 177 (citation modified).

Under NEPA, federal agencies fulfill their obligation to analyze the environmental impacts of major federal actions by: (1) preparing an environmental assessment (EA) to assess whether the action will have significant environmental impacts; (2) preparing an environmental impact statement (EIS) if the agency determines the action will have significant environmental impacts; or (3) invoking a categorical exclusion (CE). *See* 42 U.S.C. §§ 4336(b)(1)-(2), 4336c, 4336e(1). CEs are categories of actions that an agency has determined normally do not have significant effects on the environment and therefore do not require an EA or EIS, unless extraordinary circumstances make application of a CE inappropriate. *Id.* § 4336e(1). "A reviewing court may not substitute its judgment for that of the agency as to the environmental consequences of its actions." *Seven Cnty.*, 605 U.S. at 183 (citation omitted). "The bedrock principle of judicial review

in NEPA cases [is]: Deference." *Id.* at 185.

**2. NEPA does not apply because the Services have no discretion to maintain an unlawful regulation.**

By rescinding the definition of "harm," the Services corrected the regulation to align their implementation of the ESA with the best reading of the statute. The prior definition of "harm" exceeded the proper bounds of the statute. The agencies' rescission was the only proper course. Without discretion, an agency has no obligation to prepare an environmental impact analysis. *Pub. Citizen*, 541 U.S. at 767-68. If the analysis could not persuade an agency to choose among alternatives, the considered, informed decisionmaking NEPA is intended to foster has no purpose. *Id.*; *see also* 42 U.S.C. § 4336e(10)(B)(vii) ("major federal action" excludes non-discretionary activities under the agency's statutory authority). In *Alaska Wilderness*, the Ninth Circuit held that, because the agency there had no discretion under the Clean Water Act over how it should review oil spill response plans, its approval was not subject to NEPA's requirements, even if it would otherwise constitute a major federal action. *See* 788 F.3d at 1225-26. Applying NEPA would "merely 'require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform,' which would clearly violate NEPA's 'rule of reason.'" *Id.* at 1226 (quoting *Pub. Citizen*, 541 U.S. at 769).

Here, once the Services undertook rulemaking, they could not refuse to administer the ESA according to its best meaning. No amount of environmental impact analysis can change what the ESA says and means. Given that the prior definition of "harm" conflicted with the ESA and resulted in the Services exceeding the bounds of authority granted by Congress, the Services had to rescind it. No NEPA analysis was therefore required.

**3. If NEPA applies, the Services correctly applied a categorical exclusion.**

Should the Court decide that NEPA's requirements apply to the Services' rescission of the

"harm" definition, the Services nevertheless complied with NEPA. The Services properly relied on one of Interior's CE's, 43 C.F.R. § 46.210(i), for this type of regulation because it is administrative, legal, and procedural in nature. The rulemaking simply rescinds the invalid definition of "harm" and does not authorize physical changes to the environment. The Services, therefore, also properly determined that extraordinary circumstances did not apply to render the CE unavailable. *See Id.* § 46.215.

The Services based their CE determination on 43 C.F.R. § 46.210(i), which excludes "[p]olicies, directives, regulations, and guidelines [] that are of an administrative, financial, legal, technical, or procedural nature." 90 Fed. Reg. at 16104-05. NMFS relied on Interior's CE under the National Oceanic Atmospheric Administration's Companion Manual, Section V.F. *Id.* After considering public comments, the Services affirmed that, if NEPA applied at all, the CE applied. 91 Fed. Reg. at 43306-08; AR0038 (applying 43 C.F.R. § 46.210(i)).

"Application of a categorical exclusion is … a form of NEPA compliance," *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013), for a "category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment," 42 U.S.C. § 4336e(1). The "entire point … is to reduce the administrative burden of approving certain projects." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023). Thus, "[i]n many instances, a brief statement that a categorical exclusion is being invoked will suffice." *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002); *see also Wilderness Watch v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) (documentation "need not be detailed or lengthy"). An agency's determination to apply a CE is set aside only if arbitrary and capricious. *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1017 (4th Cir. 1985); *San Luis Obispo Mothers for Peace v. NRC*, 100 F.4th 1039, 1058 (9th Cir. 2024); *see also Maryland v. Mullin*, 831 F.Supp.3d 325, 361 (D. Md. 2026) ("[T]he role of the Court is not to question the categorical

exclusion itself or the extensiveness of review . . . but rather to consider whether the ultimate conclusion reached to apply the categorical exclusion was arbitrary or capricious.").

Here, reliance on the CE was not arbitrary and capricious. The Services' rescission of the "harm" definition was purely legal in nature and aligned the Services' regulation with the best meaning of the ESA. The Services removed a regulatory definition that improperly expanded the statute's reach, and they did not authorize or take any other action with respect to any project, permit, or species. That is a regulation of an "administrative, financial, legal, technical, or procedural nature." 43 C.F.R. § 46.210(i). The agencies therefore reasonably applied the CE.

The Services also reasonably determined that none of the extraordinary circumstances in 43 C.F.R. § 46.215 warranted further environmental analysis. AR0038. The Services considered whether extraordinary circumstances were present, including "significant impacts on species listed" under the ESA; "hav[ing] a direct relationship to other actions that implicate potentially significant environmental effects"; or involvement of "unique or unknown environmental risks." *Id.*; 43 C.F.R. § 46.215(c), (e), (g). The Services determined, however, that rescission did not implicate any of these extraordinary circumstances because it does not directly authorize or result in any physical changes to the environment. AR0038. The Services' action was not focused on or directed at devising regulations, systems, or schemes that cause specific actions, authorizations, or results in the real world, but on a purely legal and administrative readjustment compelled by the statute. Because the Services simply removed a regulatory definition that exceeded the statute, leaving the protections of the ESA's text in place and specific actions for the future, the Services' conclusion that no extraordinary circumstances apply was not arbitrary or capricious.

**III. Remedy**

The Services lawfully rescinded the regulatory definition of "harm." If the Court disagrees, relief should be limited to a declaration identifying the defect or, at most, a remand without vacatur

for the Services to reconsider the matter.

Even if vacatur constitutes an available remedy,[5] the Court should remand only; it should not also vacate the rule. The ESA does not mandate implementing regulations. The Court therefore should not compel action—the agency's prior regulation—that the law does not require. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *Regents*, 591 U.S. at 20-21 (agencies must remain free to "deal with the problem afresh" on remand). Vacatur also would have a nationwide effect, thus impermissibly providing relief beyond the organizational members whose injuries give rise to Article III standing. *Trump v. CASA, Inc.*, 606 U.S. 831, 849-53 (2025). Finally, vacatur is not automatic; it turns on the seriousness of the agency's errors and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted); *see Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018) (noting that the Fourth Circuit has not "formally embraced" the approach in *Allied-Signal* but considering the seriousness of agency error in its analysis). The rescission rests on the Services' legal conclusion that the prior definition does not reflect the single, best meaning of the statute. 91 Fed. Reg. at 43301-02. Any procedural or explanatory defect would leave that conclusion intact and be readily cured on remand. And vacatur would cast significant uncertainty and confusion on regulators, regulated agencies, and regulated parties during a remand, which benefits no one. The Court therefore should uphold the rule or, at a minimum, remand it without vacatur.

## CONCLUSION

The Court should grant summary judgment for Federal Defendants, upholding the Services' rescission of a regulation that exceeded the authority Congress granted them in the ESA.

---

[5] The APA contemplates traditional relief, not vacatur of agency rules. 5 U.S.C. § 703; *see United States v. Texas,* 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring). The Services raise this argument to preserve it for further review on appeal.

Defendants also respectfully request that the Court rule on this motion in an expedited manner.

Dated: October 7, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division
United States Department of Justice

MEREDITH L. FLAX, Deputy Section Chief
MICHAEL R. EITEL, Assistant Section Chief

*/s/ Sara M. Warren*
SARA M. WARREN, Trial Attorney (GA Bar 966948)
MICHELLE M. SPATZ, Senior Trial Attorney (DC Bar 1044400)
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
202-598-5785 (Warren); 202-598-9741 (Spatz)
sara.warren@usdoj.gov; michelle.spatz@usdoj.gov

ALEC BOWMAN, Trial Attorney (DC Bar 90019707)
Natural Resources Section
150 M Street NE
Washington, D.C. 20002
202-532-3098
alec.bowman@usdoj.gov
*Attorneys for Federal Defendants*